OPINION
Appellant, Shirley Cornwell, appeals the jury verdict entered against her in the Trumbull County Court of Common Pleas. Appellant was found guilty of two counts of felonious assault in violation of R.C. 2903.11(A)(1); and two counts of endangering children, one count in violation of R.C. 2919.22(B)(2) and (B)(3) and one count in violation of R.C. 2919.22(B)(1), with a specification of serious physical harm. For the reasons that follow, we affirm in part, reverse in part, and remand the case for further action.
The case arose as a result of allegations that appellant maltreated a five-year-old unrelated child ("the child") for whom she was caring, by denying her food/liquids to the point of malnourishment/starvation, by beating her and by severely burning her. Appellant and her sister, Joyce Cornwell, had assumed responsibility for the child and the child's seven-year-old brother with the knowledge and permission of the child's mother. The state charged appellant, Joyce Cornwell, and the child's mother as co- defendants in the case.
Appellant was indicted by the May 1994 Term of the Grand Jury of Trumbull County on six counts. Counts one and three were for felonious assault, in violation of R.C. 2903.11(A)(1); counts two, four, and five were for endangering children, in violation of R.C.2919.22(B)(2) and (B)(3) with a specification of serious physical harm under R.C. 2941.143. Count six was for endangering children in violation of R.C. 2919.22(B)(1), also with the specification.
At the trial of appellant, the state alleged that during the winter of 1994, appellant engaged in a pattern of abusive behavior towards the child, including beating her and depriving her of food/liquids. The abusive behavior culminated in an incident on May 25, 1994 in which appellant was alleged to have smashed the child's head against the wall and intentionally immersed the child in scalding hot bath water at appellant's residence in Hubbard, Trumbull County, Ohio.[1] The child was hospitalized for a period of approximately thirty days following the burn incident at Akron Children's Hospital Burn Unit.
According to medical testimony presented at trial, the child suffered second and third degree burns on her back, buttocks, and perineum as a result of an intentional immersion in scalding hot water. The child also suffered from severe malnutrition and substantial bruising as a result of intentionally inflicted beatings. Specifically, the child had several large, unusual bruises across her forehead and left ear, as well as a strange pattern of bruising of her feet and toes. An expert from Akron Children's Hospital opined that these bruises were intentionally inflicted and could not have occurred accidentally. The child testified in her video deposition that appellant was responsible for the abuse.[2]
Appellant and Joyce Cornwell both testified at appellant's trial. The two stated that they never starved, beat, or burned the child. They alleged instead that the child had an eating disorder whereby she would eat excessively to the point where she would vomit, and that the child would eat out of the trash and off the street. Appellant and Joyce Cornwell testified that it was the child's seven-year-old brother, rather than appellant, who beat the child and caused the bruises on the child's body. Appellant further testified that it was either the child or her brother who turned on the hot water faucet while the child was in the bathtub, and that she, herself, did not intentionally immerse the child in hot water. Appellant testified that the bathtub incident occurred at the residence in Trumbull County.
Following her trial by jury in late October and November 1995, appellant was found guilty of counts one and three for felonious assault and counts five and six for endangering children, count six with a specification of serious physical harm. The state entered a nolle prosequi on counts two and four for child endangering.
The trial court sentenced appellant to an indeterminate period of eight to fifteen years of incarceration for each of the two counts of felonious assault. The counts were to run concurrently with each other. She was also sentenced to a period of two years for count five of endangering children. This sentence was also to run concurrently with the sentences for felonious assault. Finally, she was sentenced to a period of five years for count six of endangering children with specification of serious physical harm. This count was, however, to run consecutively to the other counts.
Appellant appeals, asserting four assignments of error:
 1. Appellant's right to Due Process of Law under the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution were violated by Appellee, State of Ohio's [sic] failure to specify to any degree, either by indictment or by the provision of an adequate bill of particulars the dates and times alleged in the offenses of Child Endangerment as contained in Counts 5 and 6.
 2. The evidence to sustain the convictions of Endangering Children was insufficient as a matter of law.
 3. The State's expert witness testimony violated the Hearsay Rule in its failure to fall under the Evid.R. 803(4) Exception; said expert's statements regarding credibility was [sic] not harmless error.
 4. "Appellant was denied the Effective Assistance of Counsel as against the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution and to a Fair Trial by virtue of the failure of trial counsel to object to `other acts' testimony, admitted in violation of Rule 403 and 404 of the Ohio Rules of Evidence."
In the first assignment of error, appellant argues that her convictions on counts five and six fail as appellant's rights to due process and to a fair trial were violated by the state's failure to provide appellant with an adequate bill of particulars on these counts.
Regarding counts five and six, the bill of particulars read in pertinent part:
 "With regard to Count 5 of the indictment, the State submits the evidence will show that on or about the Winter of 1994, the defendant, at 6480 Mason Drive, Hubbard, Ohio, Trumbull County, being the person having custody or control of * * * [the child], age 5, did administer corporal punishment or other physical disciplinary measures, to wit: continued beatings. This corporal punishment or other physical disciplinary measures were excessive under the circumstances and created a substantial risk of serious physical harm to the child.
 "There is also a specification to Count 5, that the defendant's actions under Count 5 did result in serious physical harm to * * * [the child], to wit: multiple bruising, cuts and scratches to her head and body resulting in swelling and scarring.
 "With regard to Count 6 of the indictment, the State alleges the evidence will show that on or about the Winter of 1994, at 6480 Mason Drive, Hubbard, Ohio, Trumbull County, the defendant, being the person having custody or control of * * * [the child], age 5, did abuse * * * [the child], to wit: withheld food from her.
 "There is a specification to Count 6 that the defendant's actions did result in serious physical harm to * * * [the child], to wit: there was a serious loss of weight."
Appellant argues that she was unable to prepare an adequate defense as a result of the inadequate bill of particulars, presumably because of the use of the time frame of "Winter of 1994," rather than exact dates.[3] We disagree.
The state has an obligation, in response to a request for a bill of particulars, to supply specific dates and times with regard to the alleged offense where it possesses such information.State v. Sellards (1985), 17 Ohio St.3d 169, syllabus. However, the precise times and dates are not ordinarily essential elements of offenses. Id. at 171. Thus, "a certain degree of inexactitude in averring the date of the offense is not per se impermissible or fatal to the prosecution." State v. Mundy (1994), 99 Ohio App.3d 275,296, citing Sellards and State v. Lawrinson (1990), 49 Ohio St.3d 238,239. Moreover, this court and others have recognized the difficult problem that cases of child abuse invariably present, i.e., that a victim-witness of tender years does not have the ability to remember exact dates and times. SeeState v. Barnecut (1988), 44 Ohio App.3d 149, 151; Mundy at 296;State v. Lesher (Oct. 8, 1993), Geauga App. No. 92-G-1681, unreported, at 15, 1993 Ohio App. LEXIS 4882.
In such a case, where the state may be unable to provide the defendant with exact dates and times due to the fallibility of a young child witness, the courts have held that "the absence of specific dates may yet be fatal to the prosecution if it resultsin material detriment to the accused's ability to fairly defendhimself, as where the accused asserts an alibi or claims that hewas indisputably elsewhere during part, but not all, of theinterval specified." (Emphasis added.) Mundy at 296. The record before us indicates that appellant has made no argument that the state was somehow withholding the exact dates and times of the events.
Under the particular facts and circumstances in this case, an excerpt from Mundy is instructive:
 "`A defendant is not prejudiced by the failure of the indictment to specify the dates and times upon which the charged offenses allegedly occurred if such failure does not impose a material detriment to the preparation of his defense. Where the defendant does not present an alibi defense, where he concedes to being alone with the victims of the alleged sex offenses at various times throughout the relevant time frame, and where his defense is that the alleged touchings never happened, the inexactitude of dates or times in the indictment is not prejudicial error.'" Mundy
at 297, quoting Barnecut.
Like the defendants in Barnecut and Mundy, appellant did not file notice of an alibi defense; appellant conceded to having access to, as well as care of, the alleged child victim during the 1993-94 school year and "on and off since [she] was born," and appellant presented a defense which invoked issues of credibility unrelated to the lack of any exact date or time in the indictment or bill of particulars.
Specifically, appellant's defense at trial was that the child's brother inflicted the beatings upon the child, rather than appellant; and, the child was malnourished due to an eating disorder, through no fault of appellant. The date of the scalding was also a non-issue. As appellant has failed to demonstrate that she suffered material detriment by virtue of any inexactitude in the bill of particulars, no prejudicial error can be found.[4]
However, the adequacy of the bill of particulars does not alleviate the need for the state to present sufficient evidence placing the alleged events within the specified time frame. In her second assignment of error, appellant argues that the evidence presented was insufficient to sustain the convictions of endangering children as a matter of law. Appellant was convicted on counts five and six of endangering children pursuant to R.C.2919.22(B)(2) and (B)(3) and 2919.22(B)(1), respectively, with a specification of serious physical harm on count six.[5] These provisions read in pertinent part:
 (B) No person shall do any of the following to a child under eighteen years of age * * *:
(1) Abuse the child;
(2) Torture or cruelly abuse the child;
 (3) Administer corporal punishment or other physical disciplinary measure, or physically restrain the child in a cruel manner or for a prolonged period, which punishment, discipline, or restraint is excessive under the circumstances and creates a substantial risk of serious physical harm to the child;
 (4) "Repeatedly administer unwarranted disciplinary measures to the child, when there is a substantial risk that such conduct, if continued, will seriously impair or retard the child's mental health or development [.]"
The test for reviewing a challenge based on sufficiency of the evidence is found at paragraph two of the syllabus of State v.Jenks (1991), 61 Ohio St.3d 259:
 "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Jenks at paragraph two of the syllabus.[6]
Appellant now argues, in particular, that the state failed to prove that the offenses charged in counts five and six took place during the winter of 1994; that appellant was together with the child during the winter of 1994 and thus the state failed to prove that appellant could and did, in fact, commit the offenses; and that the offenses took place in Trumbull County. Appellant argues that this constitutes a failure on the part of the state to demonstrate that the Trumbull County Court of Common Pleas had territorial jurisdiction to hear the case.
Appellant argues in her first assertion that the state failed to present sufficient evidence that the offenses charged in counts five and six took place during the winter of 1994. In regard to count six, a review of the record indicates that the state did present evidence, when viewed in a light most favorable to the prosecution, upon which a rational trier of fact could find that the offense and specification charged in count six, i.e., the deprivation of food which caused serious physical harm to the child, occurred during the winter of 1994. As previously indicated, January, February, and March of 1994 would have been the winter months at issue.
Specifically, the state presented medical evidence from the child's regular physician, Dr. Pawolski, that she lost significant weight during the period between two visits to his office on January 6, 1994 and May 16, 1994, and that it appeared that she was "failing to thrive." Moreover, the state presented testimony from a surgeon at Akron Children's Hospital who was the child's attending physician, Dr. John Crow ("Dr. Crow"). Dr. Crow stated that the child was "the worst case of malnutrition" he had ever seen when she was admitted to the Burn Unit on May 25, 1994. Although he could not give an exact number, he indicated that it would take several months prior to this date for such a state of malnutrition to develop. Dr. Crow further testified as to the permanent damage he expected the child to suffer as a result of the malnutrition.
We determine, however, that appellant is correct in her assertion as to count five that the state failed to present sufficient evidence upon which a rational trier of fact could conclude that the offense charged in that count (the physical abuse/beatings), occurred during the winter of 1994.[7] While we agree that there was graphic evidence of the child having been recently beaten at the time of her admission to the hospital, there was neither testimony nor physical evidence presented at trial which would indicate that the child had been beaten and/or physically abused per count five during the winter of 1994. As previously indicated, the scalding and the head injury were separately charged in counts one and three, respectively.
Although there was abundant physical evidence to corroborate the child's testimony that appellant had beaten her recently, there was no evidence of specific dates or any other time frame which corresponded to the winter of 1994. From the medical testimony of the staff of Akron Children's Hospital, as well as the photographic evidence, a rational trier of fact could only
conclude that the documented physical abuse occurred in mid-May 1994. While this evidence demonstrated severe, intentionally inflicted bruises over various parts of the child's body, x-rays revealed no broken bones or evidence of abuse which was more than two weeks old at the time of the child's admittance to the hospital on May 25, 1994. Thus, the evidence of the beatings and bruising alleged in count five could not have referenced January, February, or March of 1994. The conviction on the fifth count must be reversed.
In appellant's second assertion, she argues that the state failed to prove by sufficient evidence that appellant was present with the child during the winter of 1994. Implicit in this argument is the idea that the state failed to prove that it was appellant who committed the abuse. However, if the state produced evidence that appellant did, in fact, commit the offense, R.C.2919.22(B) does not require that appellant be the sole custodian of the child. Appellant's role as the perpetrator was established through the child's testimony that appellant committed the alleged acts of abuse.
Moreover, when viewed in the light most favorable to the prosecution, the state introduced sufficient evidence to convince a rational trier of fact that appellant "took care" of the child during the winter of 1994. Specifically, one of the teachers from the child's brother's school, Mrs. Motheral, testified that she understood that appellant and her sister, Joyce Cornwell, were taking care of the child and her brother during the 1993-94 school year, a period which obviously includes the winter of 1994. Indeed, Mrs. Motheral testified that appellant told her that she and her sister were taking care of both children during the 1993-94 school year.
Appellant herself testified that she had been taking care of the child and her brother "on and off" since their births. She further indicated that the children spent approximately three to five nights a week with her either in Hubbard or in Youngstown. A reasonable inference could be drawn that, during the winter of 1994, appellant was significantly involved in the care of the child and her brother at least three to five nights a week until May 25, 1994, when the child was admitted to the hospital.
Finally, appellant asserts that the state failed to prove territorial jurisdiction because the state failed to introduce evidence that the offenses alleged in counts five and six occurred in Trumbull County. We agree, however, with appellee's argument that this raises primarily a question of venue and not jurisdiction. In essence, appellant is alleging that the state failed to prove that the offenses alleged in counts five and six occurred in Trumbull County.
While venue is not a material element of any offense charged, venue is a fact which must be proven by the state in all criminal prosecutions unless waived. State v. Draggo (1981), 65 Ohio St.2d 88,90. Venue need not be proven in express terms, so long as it is established by all of the facts and circumstances in the case.State v. Gribble (1970), 24 Ohio St.2d 85, paragraph two of the syllabus. Moreover, if the defendant is engaged in a continuing course of conduct, the state need only prove that one offense or one element of an offense occurred in a particular county in order to establish venue for the entire crime or course of criminal conduct in that county. State v. Fowler (1985), 27 Ohio App.3d 149,154.
R.C. 2901.12 governs venue in criminal cases in Ohio. It reads in pertinent part:
 "(A) The trial of a criminal case in this state shall be held in a court having jurisdiction of the subject matter, and in the territory of which the offense or any element of the offense was committed.
"* * *
 "(H) When an offender, as part of a course of criminal conduct, commits offenses in different jurisdictions, he may be tried for all of those offenses in any jurisdiction in which one of those offenses or any element of one those offenses occurred. Without limitation on the evidence that may be used to establish such course of criminal conduct, any of the following is prima-facie evidence of a course of criminal conduct:
 "(1) The offenses involved the same victim, or victims of the same type or from the same group.
 "(2) The offenses were committed by the offender in his same employment, or capacity, or relationship to another." (Emphasis added.)
It is clear from the face of the statute that venue was proper in Trumbull County because (1) at least one of the offenses undisputably occurred in Trumbull County, i.e., the burning incident in Hubbard; and (2) appellant was engaged in a prima facie course of criminal conduct as the victim was the same throughout all counts, and appellant held the same admitted relationship as "care-giver" to the child in all counts. See, also, State v. Urvan (1982), 4 Ohio App.3d 151; State v. Clelland
(1992), 83 Ohio App.3d 474, 483.
In light of the foregoing analysis, appellant's first and second assignments of error are without merit, with the exception of the fifth count.
In appellant's third assignment of error, appellant argues that the admission of testimony from one of the state's expert witness, Betty Davis ("Davis"), violated the hearsay rule as it did not properly fall under an exception to hearsay in Evid.R. 803(4). Further, appellant argues that because Davis opined as to the veracity of the child during her testimony, this admission resulted in reversible error. We disagree.
Davis was employed as a staff therapist at Akron Children's Hospital. Approximately three weeks after the child's admittance to hospital, the child's attending physician, Dr. Crow, requested that Davis conduct a "sex abuse evaluation" to determine whether the child had been sexually abused.[8] While Davis was conducting the forty-five minute session, the child revealed that it was appellant who was responsible for immersing her in scalding water. Although Davis ultimately determined that the child had not been sexually abused, the state called her to testify to the identification statements made by the child during the course of the session pursuant to Evid.R. 803(4).
Appellant's counsel filed a motion in limine to exclude Davis' testimony, arguing that the session with Davis was done for purposes other than treatment of a particular injury. The state argued that Davis was acting on behalf of Dr. Crow, and that Davis was an "extension" of Dr. Crow at that point, as he needed to know whether the child had been sexually abused in order to treat her for such abuse.
The court held a lengthy side bar conference on the arguments raised by counsel, ultimately determining that it would allow Davis to testify to the hearsay statements of the child pursuant to Evid.R. 803(4). The court believed that the child's attending physician, Dr. Crow, sought the interview to determine what further treatment, if any, was necessary for the child. The court noted that the session with Davis was the first attempt on the part of Dr. Crow to involve other professionals in the diagnosis or treatment of the mental health condition of the child. The trial court placed the following statement in the record so that the "upper court" would understand its reasoning in allowing Davis' testimony:
 "* * * I think that Dr. Crow, because of the situation that he found with the burns was reasonable and logical to assume that if that type of abuse had occurred, then there would be other types of abuse. It would be reasonable or pertinent to diagnose for treatment to have inquiry made along that line, that was done. During the course of that inquiry, these other statements that were made, although hearsay, although the declarant is available as a witness, would be admissible under rule 803 as the hearsay exception."
While Davis was on the stand, she testified that her duties at the hospital primarily involved counseling preschool and primary aged children, parental counseling as well as some inpatient and outpatient sexual abuse assessments and counseling. She indicated that it was common practice to receive referrals for sexual abuse evaluations from the treating physicians at the hospital. Her qualifications included a master's degree in child development; however, she did not hold any license. When asked to describe the interview she conducted with the child, Davis responded:
 "Typically these interviews are more of a dialogue than an interrogation; that is, there's usually some play involved, so that it is more of a talk and play kind of situation. I usually have crayons or magic markers with me, sometimes play dough; talk to a child in terms of good and bad touches, let them know that the doctor asked me to come and speak with him about touching problems. Usually ask them if they can tell me why they are in the hospital and typically with a younger child, we'll also take the anatomically correct dolls along to use as an interview tool when we get to the questions around sexual touching."
The prosecutor then asked her: "How did * * * [the child] respond to your interview with her?" Davis answered:
 "* * * [The child] was a very articulate little girl, surprisingly articulate, very verbal. Somewhat reluctant to come with me, which I thought was quite normal under the circumstances. Very comfortable in the hospital situation, was able to come to the interview room with the support of her favorite nurse, and she showed some anxiety in that she needed to have a bathroom break in the middle of the 45 minute interview, which is not uncommon with children when you're talking about emotion and difficult topics. She was very believable." (Emphasis added.)
Appellant's counsel moved for a mistrial on the grounds that no curative instruction could overcome Davis' statement that the child was "very believable." The trial court overruled the motion and immediately gave the following curative instruction to the jury:
 "Ladies and Gentlemen, let me explain something further to you here. What Mrs. Davis has just done is not uncommon because when we talk among each other, we have dialogue with another person, we use certain forms of speech. Many of those forms of speech are not permitted in a Courtroom setting from an evidentiary standpoint. The witness has made, expressed an opinion, it was not an opinion that was solicited from the Prosecution, but it was given. It is not unusual that something of that nature would occur. It is most important that the Jury understand that the question, any question of believability by any of these witnesses, as to the facts is what you must decide, and none of the witnesses can infringe or should be allowed to infringe on that right that you have. So for that reason, and I'm not censoring you Miss Davis, but please don't express any opinions of that nature during the rest of your testimony, because the Jury must disregard that, because that's a decision that you have to make after you have heard all of the evidence and the law. You're going to decide if you wish to believe based on that evidence and the law."
Davis was allowed to continue her testimony. She stated that she asked the child why she was in the hospital and asked the child if she knew the difference between "good touches" and "bad touches." The child told her that "Aunt Shirley," i.e., appellant, put her in hot water because she had soiled herself. The child also stated that "[a] good touch was being nice, not putting people in hot water and not hitting." The child said that "bad touches" were "burning people, no marking on yourself and no marking on the walls."
On cross-examination, Davis confirmed that she wrote in her report that the child "required a great deal of coaching to come to the interview room," and that she was accompanied by her favorite nurse. There was no redirect of Davis.
Appellant makes several arguments in support of her assertion that the trial court committed reversible error by admitting this testimony. First, appellant argues that Davis should not have been allowed to testify under Evid.R. 803(4), because the trial court failed to conduct an in camera hearing to determine whether the circumstances surrounding the session with Davis indicated that the child was motivated to tell the truth as envisioned under this hearsay exception. Appellant argues that Davis could have "coached" the child to make incriminating statements identifying appellant as the perpetrator of the abuse. Appellant points to Davis' testimony that the child was "[s]omewhat reluctant to come with * * * [her]" and was able to come to the interview room only "with the support of her favorite nurse," as well as Davis' testimony that the child's reluctance was "quite normal" under the circumstances.
Evid.R. 803(4) reads in pertinent part:
 "The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
"* * *
 "(4) Statements for purposes of medical diagnosis or treatment. Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment."
We note, initially, that appellant does not challenge Davis' testimony on the grounds that Davis, as a staff therapist, would not be considered a medical professional qualified to testify to the hearsay statements of a child patient-declarant. In fact, appellant refers to Davis in her brief as a "pediatric psychological expert," rather than a "staff therapist," the title which Davis attributed to herself. Thus, Davis' status as a qualified medical professional is not an issue in the instant case.
In the case sub judice, the record demonstrates that the child's attending physician requested the consultation with Davis as part of his effort to diagnose and treat the child. We agree with the state's interpretation that Davis was apparently functioning as an "extension" or agent of Dr. Crow, in that her purpose was to advise him as to whether additional treatment was needed relative to any sexual abuse. The record reveals that, in addition to Davis, Dr. Crow referred the child to other medical personnel during the child's stay in the hospital, such as the hospital dietician, in his effort to diagnose and treat the child.
Nevertheless, as will be discussed, this court continues to experience extreme discomfort with the wholesale admission of the hearsay statements of minors made to medical personnel. We have grave doubts concerning the premise that somehow the circumstances of a medical interview will attest to the veracity and trustworthiness of the statements made by children of tender years, thus qualifying those statements as a legitimate hearsay exception. This premise is embodied in State v. Dever (1992),64 Ohio St.3d 401, 410: "Absent extraordinary circumstances, the child has no more motivation to lie than an adult would in similar circumstances. Everyday experience tells us most children know that if they do not tell the truth to the person treating them, they may get worse and not better."
However, even in Dever, the Supreme Court of Ohio attempted to qualify the kind of hearsay admissible under Evid.R. 803(4) by suggesting that the trial court first conduct an in camera hearing to determine whether the circumstances surrounding those particular statements would, indeed, motivate a very young child to tell the truth. There, the Supreme Court stated:
 "The trial court has broad discretion to determine whether a declaration should be admissible as a hearsay exception. * * * The trial court should consider the circumstances surrounding the making of the hearsay statement. If the trial court finds in voir dire that the child's statements were inappropriately influenced by another, then those statements would not have been made for the purpose of diagnosis or treatment. This inquiry will vary, depending on the facts of each case. For example, the trial court may consider whether the child's statement was in response to a suggestive or leading question (as was the case in Idaho v. Wright [(1990), 497 U.S. 805]), and any other factor which would affect the reliability of the statements (such as the bitter custody battle in State v. Boston [(1989), 46 Ohio St.3d 108]). If no such factors exist, then the evidence should be admitted. The credibility of the statements would then be for the jury to evaluate in its role as factfinder. In addition, the witness whose testimony brings in the child's hearsay statement can be cross-examined about the circumstances surrounding the making of the statement. But if the trial court discerns the existence of sufficient factors indicating that the child's statements were not made for the purpose of diagnosis or treatment, the statements must be excluded as not falling within Evid.R 803(4)." (Emphasis added.) (Citations omitted.) Id. at 410-411.
Our reading of Dever is that, although it comes close, it does not actually mandate a voir dire. As a result, in the instant case, although a voir dire of Davis' testimony would have been appropriate, we conclude that the failure to conduct such a voir dire does not mandate a reversal, particularly when there was no specific request for such a voir dire. See State v. Brown (Aug. 22, 1994), Stark App. No. CA-9543, unreported, 1994 Ohio App. LEXIS 3862.
In Brown, the defendant failed to request a separate voir dire to determine the reliability of statements made by a child declarant to a psychologist. As a consequence, the Brown court indicated that the defendant waived his right to challenge the failure to hold a voir dire on the reliability of those statements to the psychologist pursuant to Evid.R. 803(4), absent plain error. Brown at 6.
We note that, initially, the trial court in the instant case did conduct a competency voir dire to determine whether the child could testify. Moreover, the trial court held a side-bar conference, out of the hearing of the jury, to fully address appellant's counsel's objection to Davis' testimony. Appellant's trial counsel exercised his opportunity to cross-examine Davis in order to challenge the circumstances of the session. During cross-examination, appellant's counsel specifically addressed Davis' statement that the child seemed reluctant to come to the interview room. Davis responded that this reaction was quite normal and expected. At this point, it was for the jury to decide, as envisioned in Dever, whether the child's reluctance was indicative of coercion on the part of Davis or anyone else.
Additionally, the child's direct and cross-examination testimony in the case at bar was consistent with that given by Davis, namely the child clearly identified appellant as the person who hurt her. Moreover, unlike many child victims, this child was quite articulate and was, indeed, very, very persuasive. Thus, we conclude that despite the lack of a specific voir dire, the direct and cross-examination at trial of the testimony concerning the circumstances of the child's statements to Davis was sufficient to demonstrate that the child's statements were made in the course of and for the purposes of diagnosis and treatment; and, that the circumstances were not unduly suggestive. In accordance withBrown, we decline to find plain error on the facts of this case.
Next, appellant argues that it was error to admit Davis' testimony about "good touches" and "bad touches," as well as the child's statements identifying appellant as the perpetrator. She argues that those statements relate to issues outside of Davis' area of expertise of sexual abuse. We find no merit to this argument, for the reasons just given for the admission of the testimony of Davis in general. The Supreme Court in Dever made it clear that when a doctor asks questions of a child for the purposes of diagnosis and treatment, the hearsay responses are admissible pursuant to Evid.R. 803(4). Dever at 410-411. That court reasoned that those responses can include hearsay statements which name the perpetrator because the treating physician needs to know the potential and source of any sexually transmitted diseases. Dever at 413, fn. 8.
Finally, appellant argues that because Davis stated that the child was "very believable," appellant's motion for a mistrial should have been granted under the authority of State v. Boston
(1989), 46 Ohio St.3d 108. There clearly is no issue that the statement was improper. The issue is the statement's impact.
In Boston, the court stated: "An expert may not testify as to the expert's opinion of the veracity of the statements of a child declarant." Boston at syllabus. In Boston, the court reversed a conviction for gross sexual imposition on the grounds that experts improperly commented on the credibility of the child declarant to the effect that they found the child to be believable. The specific facts of Boston involved an allegation of sexual abuse against the father of a toddler following a bitter battle for the custody of the child. The father was subsequently alleged to have molested his daughter during her weekend visits with the father.
Although there was some slight physical evidence of actual penetration in Boston, there was no direct testimony from the child as to what happened because she was determined to be incompetent to testify. When two expert witnesses testified that the child did not "fantasize" the allegations, and that the child was telling the truth, the court held that it was not only improper to admit these statements, but that "it was egregious, prejudicial and constitut[ed] reversible error." Boston at 128.
Appellant cites two additional cases which followed Boston and also reversed the convictions where experts had opined as to the veracity of the child victim. See State v. Burrell (1993),89 Ohio App.3d 737; State v. Whitt (1991), 68 Ohio App.3d 752. In both of these cases, there was little if any corroborating physical evidence of sexual abuse. Thus, the trier of fact had to decide two issues: whether any abuse actually took place, and, if it did, who did it? When expert witnesses opined that the child victim was believable in these cases, they were opining that the abuse did actually occur as well. The courts, therefore, determined that this testimony infringed upon the role of the trier of fact. Accordingly, they applied Boston and reversed the convictions.
Initially, we determine the instant case to be distinguishable from Boston, Burrell, and Whitt because none of these cases contained a contemporaneous curative instruction. In the case subjudice, the court immediately recognized the error that occurred as a result of Davis' testimony that the child was "very believable." The court overruled counsel's motion for a mistrial and gave a lengthy curative instruction. This curative instruction explained to the jury that the jury was the trier of fact, not Davis, and that all issues of credibility resided within its sole discretion and determination.
In the instant case, there was also no serious issue that the scalding, bruises, and malnutrition did, in fact, happen. In other words, there was significant corroborative evidence of abuse. The question to the jury was "who" was responsible. Indeed, the defense focused on the nonresponsibility of appellant for these events, not whether the traumatic events occurred. The primary points in appellant's defense were that the events were either accidental, caused by illness or that someone else was responsible. Further, the child testified and clearly indicated who her abuser was, thus, not only was the credibility issue much narrower, but the evidence was much stronger, and a curative instruction was given immediately. Consequently, appellant has failed to demonstrate prejudicial error as a result of Davis' testimony. Appellant's third assignment of error is without merit.
In appellant's fourth and final assignment of error, appellant argues that she was denied the effective assistance of trial counsel in violation of her state and federal constitutional rights by trial counsel's failure to object to "other acts testimony," allegedly admitted in violation of Evid.R. 403 and 404(B). We disagree.
Both the Supreme Court of Ohio and this court have adopted a basic test to determine whether an accused has received ineffective assistance of counsel:
 "`First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" State v. DiMeole (Sept. 30, 1992), Ashtabula App. No. 91-A-1680, unreported, at 8, 1992 Ohio App. LEXIS 5045, quoting Strickland v. Washington (1984), 466 U.S. 668; State v. Post (1987), 32 Ohio St.3d 380, 388.
This test requires the defendant to show that but for the deficient performance, there was a reasonable probability that the proceedings would have been different. State v. Phillips (1995),74 Ohio St.3d 72, 84.
Appellant argues that trial counsel's performance was deficient because he failed to object to prejudicial testimony from state witnesses which indicated that appellant was withholding food from the child's brother and that appellant came to the brother's school to punish him publicly for stealing food.
Indeed, the record reveals that, in opening arguments, the state made numerous references to its theory that appellant abused and starved the child's brother, in addition to the child. The state also opened its case-in-chief by introducing several witnesses from the child's brother's school who testified that the boy appeared hungry, was performing poorly in school, and was stealing food from the other children and from teachers at his school. His teacher testified to one incident in the 1993-94 school year in which the brother had been caught stealing a candy bar. Appellant came to the school and repeatedly smacked the boy's hands with her key ring. Appellant's trial counsel did not object to the prosecutor's opening remarks or to any of the testimony of the teachers at the brother's school.
However, the record also reveals that initially the trial court and the attorneys on both sides appeared to be laboring under the impression that appellant was also charged under count six for the alleged starvation and abuse of the child's brother, as well as the child. The confusion arose because that count in the original indictment did not identify the victim by name, alleging only that appellant abused a child over whom she had custody or control. However, the bill of particulars filed by the state on October 18, 1994 clearly indicated that count six only referred to abuse against the subject child, and made no reference whatsoever to the child's brother.[9]
Then, some twelve witnesses into the state's case-in-chief, the record reveals the following discussion in chambers:
 "* * * [APPELLANT'S COUNSEL]: First of all, Your Honor, previous to coming into Court this afternoon, we had a bench conference concerning State's Exhibit 14, which involved * * * [the child's brother] and his — and what purports to be the medical records of Dr. Paloski for the treatment of * * * [the child's brother]. The issue that I raised at that time was that the indictment and the Bill of Particulars alleged no charges against this Defendant with respect to * * * [the child's brother]. After that conversation at the bench and a lengthy conversation which the Court and I were not privileged, that the Prosecutor had among — or the Prosecution among the prosecution team, the Prosecutor stated that they were going to move to dismiss count six of the indictment.
"THE COURT: That is correct.
 "* * * [APPELLANT'S COUNSEL]: Although that motion doesn't appear on the record, I believe that count six is going to be dismissed and probably take care of that. At this point, although I'm not quite sure where learned counsel is leading, he's again questioning or commencing to question Dr. Paloski on State's Exhibit 14, which at this point I question the relevance thereof and it was the reason that I asked for a bench conference prior to starting the examination of the witness.
 "* * * [COUNSEL FOR THE PROSECUTION]: If I can clarify the point. As to count six, the State intends to, as we said earlier, ask that count six be dismissed as to * * * [the child's brother], which was the letter dated October 19, 1994 from Mr. Wrenn where he said that count six pertained to * * * [the child's brother], even though the Bill of Particulars named * * * [the child] in count six, and the indictment I believe was general. It didn't name a specific child. So count six as to * * * [the child] is still there. That has always been the case and that was the information that was previously supplied to you, but as it pertains to * * * [the child's brother], though * * * [he] is not at issue in count six. The only point in bringing up Exhibit 14 with the doctor, he was the physician for both children, and at this point, we're going to go through what he saw in * * * [the child's brother] and if he saw similarities between the two kids as far as any eating disorders and whatever if the same was being reported on the boy as it was on the girl.
 "THE COURT: That appears to be relevant testimony, not in regard, the Defendant being charged with anything to do with * * * [the child's brother], but similarity of treatment, similarity of complaints made. I think the State has a right to present that, and for that reason, I'm going to overrule your objection. I think I would caution the State that there's no need to get evidence in as if the count six was still outstanding. It isn't. I think you have to gauge whether the questions you ask in regard to how it is relevant to proving these other matters in regard to * * * [the child]."
From these passages, we are unable to conclude exactly what transpired as to the negotiations regarding count six of the indictment. However, we believe that all parties initially thought that appellant was also standing trial for the abuse of the child's brother under count six. Subsequent to this discussion, the state withdrew exhibits pertaining to the child's brother, and no mention was made of the boy during jury instructions pertinent to count six. Because it appears that counsel was not alone in his confusion, we are unable to say that his failure to object to the testimony regarding the child's brother amounted to a performance so deficient that he failed to function as the counsel guaranteed by the Sixth Amendment.
However, even if we were to find that counsel should have objected or pursued the previously filed motion in limine, appellant has failed to demonstrate prejudice, the second prong of the test for ineffective assistance of counsel. Namely, but for
the deficient performance, there was a reasonable probability that the outcome of the proceedings would have been different.
Indeed, we agree with the state's contention that the majority of the testimony in question would have been properly admissible under Evid.R. 404(B) and R.C. 2945.59. Therefore, appellant has failed to demonstrate prejudice by trial counsel's failure to object to the testimony.[10]
Evid.R. 404(B) reads:
 "Other crimes, wrongs acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."
Appellee argues that the apparent starvation of both the child and her brother were contemporaneous in both time and place, one with another, and would be indicative of motive, opportunity, intent, preparation, plan, knowledge and absence of mistake or accident. We agree.
The Supreme Court of Ohio addressed the admissibility of "other acts" evidence in the case of State v. Wilkinson (1980), 64 Ohio St.2d 308. It cited with favor the following passage: "`[E]vidence of other crimes may be presented when "they are so blended or connected with the one on trial as that proof of one incidentally involves the other; or explains the circumstances thereof; or tends logically to prove any element of the crime charged."'" (Citation omitted.) Id. at 317. Referring to Evid.R. 404(B), the court stated: "The rule is served well enough by a requirement that the contested evidence be inextricably intertwined and, thus, necessary to give the complete picture of what occurred." Id. at 318.
In the instant case, the testimony concerning the child's brother is inextricably intertwined with the events affecting the child. Both children lived in the same household with appellant during the winter of 1994, and, according to appellant, both children suffered the same symptoms and problems with "eating disorders." As part of the state's case, it had to prove beyond a reasonable doubt that the malnutrition of the child was not an accident or the result of a physical ailment of the child.
Moreover, one segment of the testimony referencing the brother established that appellant was caring for both children during the 1993-94 school year, thereby establishing "opportunity," as well as a time frame. Mrs. Motheral, the brother's teacher, indicated:
 "* * * Shirley told me that she and her sister were taking care of * * * [the child's brother] and that the children were both having a problem with the eating and that she and her sister did not have children, and that they would be up most of the night with the children because the children would try to get into the icebox to eat things and that it was a very exhausting experience."
Nevertheless, we agree that not all of the testimony concerning the child's brother was admissible pursuant to Evid.R. 404(B) and 403. Specifically, the testimony concerning the incident in which appellant was alleged to have smacked the boy's hands with her key ring is not directly related to the starvation charge. However, we find the reference to this fairly minor incident to be harmless error in light of the other evidence. Appellant's fourth assignment of error is not well-taken.
In light of the foregoing analysis, we determine that with the exception of the fifth count, appellant's four assignments of error are without merit. The judgment of the trial court is reversed as to the fifth count and the case remanded for further action consistent with this opinion. The judgment of the trial court as to all other counts is affirmed.
JUDITH A. CHRISTLEY, JUDGE.
FORD, P.J., and O'NEILL, J., concur.
[1] Specifically, count one was based on the alleged scalding incident and count three was based on the alleged smashing of the child's head against a wall on the same day. Count five referenced the remainder of the bruising. Count six referenced the starvation allegation.
[2] Although the direct testimony and cross-examination of the child was taken and recorded during the time of the trial, it was done out of the presence of the jury. Appellant was present through a closed circuit monitor and was visible to the child. The video was later played during the trial for the jury.
[3] Because appellant was indicted in May 1994, "Winter of 1994" could only refer to the early winter months of 1994, i.e., January, February, and March, and not the winter months at the end of 1994.
[4] Appellant also argues in the first assignment of error that no evidence was presented at trial that she and the child were ever present, together, at the stated address in Hubbard, Trumbull County, during the "Winter of 1994." As this argument is interrelated with appellant's second assignment of error, they will be addressed together. Suffice it to say, we disagree.
[5] The endangerment charge in count five referenced abuse other than the intentional scalding of the child and the smashing of the child's head against a wall which were contained in counts one and three, respectively. We note that the bill of particulars alleged that both counts one and three occurred on May 25, 1994. Count six referenced the starvation allegation.
[6] The Supreme Court of Ohio has recently affirmed the test in Jenks. See State v. Thompkins (1997), 78 Ohio St.3d 380,390 (Cook, J., concurring stating that in reviewing sufficiency, the application of the test found in the second paragraph of the syllabus of Jenks is proper).
[7] Thus, the abuse in the fifth count referenced the beatings beyond the scalding and the related head injury. In count three, the state introduced evidence that the child's head was smashed up against a wall during the scalding incident. The reference in the bill of particulars for count five to "cuts and scratches to her head" apparently referenced minor traumas to the head other than the head injury set out in count three.
[8] Although not directly stated in the record, it can be inferred that the child was not well enough to participate in such a session at an earlier time due to the child's unstable physical condition, namely the severe burns, extreme malnourished state, and the pneumonia which she developed shortly after her arrival at the hospital. Testimony revealed that the child was supported by intravenous and other internal nourishing devices, as well as a catheter, for some time after her arrival at the hospital.
[9] The record also reveals that appellant was initially represented by a public defender and later retained private counsel to represent her at trial. Before private counsel was obtained, the public defender had anticipated the introduction of evidence of "other acts" and filed a motion in limine. However, appellant's private counsel never pursued the motion before or during trial, and it appears from the record that this motion was never ruled upon by the court.
[10] R.C. 2945.59 reads:
"Proof of defendant's motive. In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant."