OPINION
Jonathan J. Miller appeals from a judgment of the Montgomery County Court of Common Pleas, entered pursuant to jury verdicts, which found him guilty of two counts of rape, two counts of gross sexual imposition, one count of menacing by stalking, and three counts of telephone harassment and sentenced him to eight years of incarceration. We note that this case was previously before us on an issue not related to this appeal. State v. Miller (Dec. 4, 1998), Montgomery App. No. 17273, unreported.
The state presented the following version of events. Miller dated Nicole Bowman from February to August 1996 while Miller was a senior in high school and Bowman was a sophomore. Bowman eventually ended the relationship because she believed Miller to be too controlling and possessive. Miller was upset and angered by Bowman's decision to end their relationship.
Following their break up, Miller began calling Bowman repeatedly, often during the late evening and night. Bowman did not initially object to the calls. When Bowman began dating other individuals, however, Miller became threatening and violent during the phone conversations. Bowman asked Miller to stop calling and her parents told Miller that she did not want to speak to him. Bowman's parents also installed a block on their telephone in an attempt to thwart Miller's calls. Miller continued to call the Bowman residence, however, from other non-blocked phone numbers. Miller asked people who were mutual friends to tell Bowman to call him if she knew what was best for her. Miller also placed collect calls to the Bowman residence as a signal for Bowman to call him back. Their phone conversations were often hours long and sometimes lasted all night. Miller told her that the phone conversations were "punishment" for various "wrongs" Bowman had committed against him. If Bowman fell asleep during the conversations, Miller would yell at her to wake up. He also warned her not to hang up on him. When Bowman did hang up, Miller would drive to her parents' house, park his car, and sit in front of the house.
During the phone calls, Miller used abusive language toward Bowman. He threatened her and described, in graphic detail, how he would kill her, her boyfriend, family, and friends. He told her that he knew how to make car bombs and that she should be careful when she started her car. He also said that he was going to knock her brother's head off with a baseball bat and that he thought such a death would be funny and ironic because her brother played various sports. He told her that he would kill everyone around her, leaving her all alone, and then he would kill her.
Bowman and Miller also engaged in "phone sex" during some of their phone conversations. Miller told Bowman that he had tape recorded some of the "phone sex" conversations and threatened that he would give such tapes to her boyfriend and parents.
Eventually, Miller and Bowman came to an "agreement" whereby Bowman would go to Miller's house and provide sexual favors to Miller so that Miller would then leave her, her boyfriend, friends, and family alone. On one occasion between October 1 and 31, 1996, Bowman went to Miller's house in an attempt to carry out the agreement. She unsuccessfully attempted to distract him initially. Miller had Bowman remove her clothing and he lay on top of her and tried to kiss her. He reminded her that she "kn[e]w the deal" and she knew what would happen if she failed to complete the deal. He rubbed her thighs and breasts and inserted his finger into her vagina. During this time, Bowman was crying and Miller grew irritated because she was not "playing along." Miller eventually stopped and rolled away from Bowman. She dressed quickly and left the house. Miller later informed Bowman that she had not completed their deal.
Miller's graphic threats toward Bowman, her boyfriend, family, and friends continued during the next couple of months. Sometime between May 1 and 31, 1997, Bowman went to Miller's house again. The incidents which occurred during this visit were similar to those that had happened in the first, including Miller inserting his finger into Bowman's vagina. The encounter ended when Miller became so frustrated with Bowman's failure to "play along" that he told her to "forget it."
Between September 15, 1997 and October 7, 1997, Bowman went to Miller's house for a third time in an attempt to complete the "agreement." Prior to this visit, Miller's threats had grown more violent, vulgar, and graphic. The incidents of this visit were similar to the incidents of the first two visits, including Miller inserting his finger into Bowman's vagina. Bowman eventually decided to leave. When she attempted to exit the house, Miller grabbed her and pulled her back into his house. She then pushed Miller and ran to her car. In his car, he followed her home and then parked in front of her house.
Around October 29, 1997, Bowman went to Miller's house for a fourth time. Prior to her visit, Miller had told her that she had to perform fellatio. During this encounter, Bowman placed Miller's penis in her mouth briefly, but then stopped after deciding that she did not want to do that.
On November 5, 1997, Bowman reported to the Germantown Police Department that she had been receiving harassing phone calls from Miller. During her interview with the police, Bowman eventually revealed that she had been providing sexual favors to Miller in an attempt to complete the "agreement." At her suggestion, the police provided Bowman with a tape recording device so that she could record her conversations with Miller during the late evening and early morning hours of November 5-6 and 6-7, 1997. The recorded conversations contained further threats against Bowman, her boyfriend, and family.
The defense's version of the events differed as follows. Miller testified that his sexual encounters with Bowman had been consensual. He admitted threatening Bowman and her family during the November 5-6, 1997 phone conversation, but stated that that had been the first conversation where he had threatened anyone. He said that he had not intended to carry out the threats.
Miller was arrested on November 7, 1997. On November 13, 1997, he was indicted on four counts of rape, four counts of gross sexual imposition, one count of extortion, one count of menacing by stalking, and three counts of telephone harassment. The count of extortion was later dismissed by the trial court.
A jury trial was held August 16-20, 1999. The jury found Miller guilty of two counts of rape, two counts of gross sexual imposition, one count of menacing by stalking, and three counts of telephone harassment. He was sentenced to eight years of imprisonment for each count of rape, eighteen months of imprisonment for each count of gross sexual imposition, six months for the count of menacing by stalking, and six months for each count of telephone harassment, with all of the sentences to be served concurrently. The trial court also found Miller to be a sexually oriented offender and a habitual sex offender.
 Miller advances five assignments of error on appeal. I. THE TRIAL COURT ERRED IN IMPOSING AN EIGHT YEAR SENTENCE FOR THE CONVICTIONS HEREIN.
Miller argues that the trial court erred in imposing a prison term beyond the shortest prison term authorized for the rape offenses because it failed to find on the record that the shortest prison term for the offense would have demeaned the seriousness of the offender's conduct or would not have adequately protected the public from future crime.
Miller was convicted of rape in violation of R.C. 2907.02, a felony of the first degree. R.C. 2907.02(B). For a felony of the first degree, the court shall impose a definite prison term of three, four, five, six, seven, eight, nine, or ten years. R.C. 2929.14(A)(1). If an offender has not previously served a prison term, a court imposing a prison term for a felony "shall impose the shortest prison term authorized for the offense * * * unless the court finds on the record that the shortest prison term will demean the seriousness of the offender's conduct or will not adequately protect the public from future crime by the offender or others." R.C. 2929.14(B).
Nothing in the record reveals that Miller served a prior prison term. Before sentencing Miller in open court, the trial court stated that it had carefully considered the presentence investigation and all of the evidence presented. The court then sentenced him to a definite prison term of eight years for each of the two counts of rape. As the state concedes, the trial court did not find on the record that three years of imprisonment, the shortest prison term for his crime of rape, would have demeaned the seriousness of the offender's conduct or would not have adequately protected the public from future crimes by Miller.
The first assignment of error is sustained. Because the trial court failed to clearly state its reasons for imposing a sentence beyond the minimum required sentence, we must remand this case for resentencing on the two counts of rape. See State v. Wells (1999), 133 Ohio App.3d 392,395, 728 N.E.2d 408, 410-411. On remand, the trial court should first reexamine the evidence presented in this case and then impose appropriate sentences for the rape counts by applying the correct statutory factors, making the necessary findings, and expressly stating its reasons for imposing such sentences on the record. The trial court should not simply make a finding on the record to support the imposition of its original sentences which were beyond the minimum required sentences. Instead, the trial court needs to redetermine what the appropriate sentences for the rape counts should be and then state its reasoning for such conclusion on the record. We do not mean to suggest, however, that the trial court is precluded from reimposing the original sentences if, upon proper analysis, it remains convinced that they are appropriate.
 II. THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN ALLOWING POLICE OFFICERS TO TESTIFY THAT THEIR "INVESTIGATION" WAS "CONSISTENT" WITH A CRIME HAVING OCCURRED OR PROSECUTION WITNESSES WERE CREDIBLE.
Miller argues that the trial court erred in allowing the state to bolster Bowman's credibility by asking police officers whether their investigation had been consistent with her allegations. Specifically, Miller points to the following exchanges between the prosecutor and Germantown Police Officer Scott Brown:
 Q: You often get prank calls or prank complaints, do you not, in your department?
A: Yes.
 Q: In your capacity and in your experience in eight years of police work, based on the demeanor that you observed, did it appear that [Bowman] was engaging in a prank?
A: No. [Tr.p. 240]
* * *
 Q: You had indicated on cross-examination that [Bowman] told you that she lied to [Miller]; is that correct?
A: Yes.
* * *
Q: Any other lies she indicated to you that she told?
A: No.
Q: In the course of your interview with her, * * * did you catch her in any other lies?
A: No.
Q: You've been a police officer I think you said for eight years?
A: Yes.
 Q: You've had situations where kids, juveniles are in situations and they don't always tell their parents?
A: Yes
Q: Doesn't mean they're lying in your mind, does it?
 * * * A: No.
During the state's questioning of Germantown Police Officer Dena Neal, the following occurred:
 Q: In your experience as a police officer, at th[e] early stage of the investigation, did you perceive that [Bowman] was just doing this just to get attention?
* * *
A: No, I did not, not at all. [Tr.p. 272-274]
We note that Miller's attorney preserved Miller's right to raise this issue on appeal by timely objecting to the state's questions, supra.
Miller argues that the admission of these testimonies violated State v. Boston (1989), 46 Ohio St.3d 108, 545 N.E.2d 1220. In Boston, a jury found a father guilty of gross sexual imposition against his two year old daughter. Boston, 465 Ohio St.3d at 108, 111, 545 N.E.2d at 1222, 1225. During his trial, the court allowed a pediatrician who had examined the child to testify that the child had neither fantasized her abuse nor been programmed to make the accusations of abuse. Id. at 109, 128,545 N.E.2d at 1223, 1240. The court also allowed a counselor who had examined the child to testify that the child had been telling the truth. Id. at 109, 129, 545 N.E.2d at 1223, 1240. The supreme court concluded that the admission of these testimonies was improper, egregious, prejudicial, and constituted reversible error. Id. at 128, 545 N.E.2d at 1240. The court explained that the admission of testimony which, in effect, declared that the child's statements had been truthful "acted as a litmus test of the key issue in the case and infringed upon the role of the fact finder, who is charged with making determinations of veracity and credibility." Id. at 128-129, 545 N.E.2d at 1240. (quotation omitted). The court emphasized that "[i]n our system of justice it is the fact finder, not the so-called expert or lay witnesses, who bears the burden of assessing the credibility and veracity of witnesses." (Emphasis added.) Id. at 129, 545 N.E.2d at 1240. (quotation omitted).
The supreme court further explained its holding in Boston in State v. Stowers (1998), 81 Ohio St.3d 260, 690 N.E.2d 881. In Stowers, a jury found a father guilty of four counts of rape against his children. Stowers, 81 Ohio St.3d at 260, 690 N.E.2d at 882. At his trial, the court allowed a clinical psychologist to offer expert testimony that the behavior of the children, who had changed their stories between their initial questioning and the time of trial, had been consistent with the behavior of children who had been sexually abused. Id. On appeal, the father argued that the expert's testimony had "served to bolster the children's credibility in violation of the Boston holding." Id. at 262,690 N.E.2d at 883-884. In holding that the expert's testimony had not been in violation of Boston, the supreme court noted a distinction between "expert testimony that a child is telling the truth and evidence which bolsters a child's credibility insofar as it supports the prosecution's efforts to prove that a child has been abused." (Emphasis sic.) Id. at 262-263, 690 N.E.2d at 884. The court stated:
 Boston's syllabus excludes expert testimony offering an opinion as to the truth of a child's statements (e.g., the child does or does not appear to be fantasizing or to have been programmed, or is or is not truthful in accusing a particular person). It does not proscribe testimony which is additional support for the truth of the facts testified to by the child, or which assists the fact finder in assessing the child's veracity.
Id. at 262-263, 690 N.E.2d at 884. The court concluded that the expert's testimony stating that even though the children had changed their stories, her assessment that they had been abused had not changed was "permitted to counterbalance the trier of fact's natural tendency to assess recantation and delayed disclosure as weighing against the believability and truthfulness of the witness." Id. at 263,690 N.E.2d at 884. The court further stated that "[t]his testimony does not usurp the role of the jury, but rather gives information to a jury which helps it make an educated determination." Id. (quotation omitted).
The state argues that the police officers' testimonies did not violate Boston because the police officers were not testifying as experts in this case. This argument is not persuasive for two reasons. First, we believe that jurors are likely to perceive police officers as expert witnesses, especially when such officers are giving opinions about the present case based upon their previous experiences with other cases. Second, and more importantly, the language of Boston, supra, makes it clear that the holding of that case applies to lay persons as well as experts. Boston, 46 Ohio St.3d at 129, 545 N.E.2d at 1240. (quotation omitted). Thus, regardless of whether a police officer testifies as an expert or lay witness, his testimony cannot violate Boston.
The police officers' testimonies, supra, were in direct violation of Boston because they offered an opinion as to the truth of Bowman's accusations. See State v. Coffman (1998), 130 Ohio App.3d 467, 474,720 N.E.2d 545, 550. In effect, their testimonies declared that Bowman's statements were truthful and that Miller had committed the alleged acts against her. As such, they infringed upon the role of the jury which, as the fact finder, was charged with assessing the veracity and credibility of Bowman and Miller. Although it might appear that the state elicited these testimonies to counterbalance the jury's natural tendency to assess Bowman's delayed disclosure to authorities and her lie to Miller as weighing against her believability and truthfulness as is permitted by Stowers, the context in which these testimonies were given and the overall record do not support that conclusion. Instead, it is clear on this record that these questions were attempts by the state to include the police officers' testimonies regarding the truthfulness of Bowman. See Coffman, 130 Ohio App.3d at 474, 720 N.E.2d at 550. We thus conclude that the admission of the officers' testimonies was improper.
We must determine, however, whether such error was harmless beyond a reasonable doubt in this case. The erroneous admission of statements in violation of Boston is more likely to be harmless if the case involved a bench trial instead of a jury trial. See Coffman, 130 Ohio App.3d at 476, 720 N.E.2d at 551. Further, the erroneous admission of statements in violation of Boston is more likely to be prejudicial if the case was essentially a "credibility contest" between the victim and the defendant without independent evidence of the alleged crimes. State v. Palmer (Feb. 8, 1995), Medina App. No. CIV. A. 2323-M, unreported.
We recognize that the Ninth Appellate District has stated that the admission of statements in violation of Boston can be harmless "if the victim testifies and is subject to cross examination, the state introduces substantial medical evidence of sexual abuse, and the expert's testimony is cumulative to other evidence." State v. Kincaid (Oct. 18, 1995), Lorain App. Nos. 94CA005942, 94CA005945, unreported; see, also, Palmer, supra. Those cases, however, are distinguishable from the case before us. Kincaid involved the rape and gross sexual imposition of a victim that was six years old or younger. Palmer involved the felonious sexual penetration of a victim who was seven years old. It is understandable that the court required substantial medical evidence of the sexual abuse when the victims in Kincaid and Palmer were so young. Our case is distinguishable, however, because it involved a teenage girl consenting to sexual acts under a threat of force. Further, Bowman alleged that she had performed oral sex on Miller and that he had inserted his finger into her vagina. Neither of those actions would be likely to leave detectable medical evidence. Thus, because the facts of our case a dissimilar, we will not follow the holdings in Kincaid and Palmer in this case.
While the case before us was tried to a jury and did essentially involve a credibility contest between Miller and Bowman, the record in this case leads us to conclude that the trial court's error in allowing the challenged testimony was harmless beyond a reasonable doubt. Although the accounts offered by Bowman and Miller varied greatly, independent evidence of the alleged crimes was introduced to the jury. During the trial, tape recordings of phone conversations between Miller and Bowman were played for the jury. Those tapes offered abundant evidence that he had committed the alleged crimes and that Bowman's allegations were, in fact, true. During these conversations, Bowman made references to having been previously forced to perform sexual acts for Miller against her will and Miller did not dispute or question such references. Further, Miller referenced previous threats that he had issued toward Bowman, her family, and friends. He also made multiple violent, and at times quite graphic, threats toward Bowman, her family, and friends while talking to her. Not only did the taped phone conversations reveal evidence which clearly corroborated Bowman's accusations, but in listening to the tapes, the jurors heard Miller, in his own voice, offer corroboration for Bowman's allegations. Thus, in light of all of the evidence presented at trial, we cannot conclude that the admission of the challenged statements prejudicially affected the fairness or result of Miller's trial. The trial court's admission of the challenged statements was, therefore, harmless beyond a reasonable doubt.
As we come to this conclusion, however, we must caution the state. Boston makes it clear that witnesses are not to offer opinions on the truthfulness of a victim's accusations. The state elicits such opinion evidence at its peril, particuIarly where the evidence essentially involves a credibility contest and significant independent evidence of the offenses-unlike in this case-is lacking.
The second assignment of error is overruled.
 III. THE TRIAL COURT ERRED IN EXCLUDING THE TESTIMONY OF APPELLANT'S EXPERT WITNESS.
Miller argues that the trial court erred when it excluded the testimony of psychologist Dr. Kathleen Burch. Miller's attorney proffered that Burch would have explained Miller's emotional state at the time he had made the phone calls and discussed whether that mental state could have correlated to any violent or aggressive sexual behavior.
Evid.R. 403(A) states that relevant evidence "is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Although there might have been a limited proper purpose for Burch's testimony, the probative value of such testimony was substantially outweighed by its prejudicial effect. The expert's testimony would have, in essence, told the jury that Miller's aggressive language could not necessarily be correlated to the alleged sexual acts. This likely would have confused or misled the jurors because no one was arguing that Miller's aggressive language was proof that he had committed the alleged sexual acts. Further, while the tone of Miller's language, i.e., aggressiveness, itself was not proof that Miller had committed the alleged acts, the actual words that were aggressively spoken by Miller, i.e., the threats, were proof which could properly have weighed in favor of Miller's guilt. Because there was a substantial danger that Burch's testimony would have confused and misled the jury, the trial court did not err, and acted within the bounds of its discretion, in determining that it was not admissible.
The third assignment of error is overruled.
 IV. THE TRIAL COURT ERRED AND THEREBY DENIED APPELLANT A FAIR TRIAL BY ADMITTING OTHER EVIDENCE ERRONEOUSLY.
Miller argues that he was deprived of a fair trial because the trial court erred in admitting specific exhibits and allowing certain testimonies. He first asserts that the trial court erred in admitting Bowman's prior consistent written statements because such statements were hearsay.
Two witness statements were written by Bowman. Prior to Bowman's testimony at trial, Officer Brown testified that he had obtained a written statement from Bowman and[Ex.6] Officer Neal testified that she had witnessed a statement which Bowman had written at her request. The prosecutor attempted to have Neal read the statement that she had witnessed, but Miller's attorney objected, arguing that the document was hearsay, and the trial court sustained his objection.[Ex.1] Bowman read the witness statement she had given to Neal during her direct examination. At the end of the state's case in chief, both exhibits were admitted into evidence by the trial court over objection.
"`Hearsay' is a statement, other than one made by the declarant while testifying at the trial * * *, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C).
Evid.R. 801(D)(1) states that a statement is not hearsay if:
 * * * The declarant testifies at the trial * * * and is subject to cross-examination concerning the statement, and the statement is * * * (b) consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive[.]
As to her statement to Neal, Bowman testified at trial, was cross examined by Miller's attorney, and the contents of her witness statement were consistent with her testimony. Thus, we must only determine whether the statement was properly offered to rebut an express or implied charge of recent fabrication or improper influence or motive.
Throughout the trial, Miller's defense was that Bowman was lying and that she had been motivated to make the allegations because she had feared that Miller would carry out his threat of disclosing the phone sex tapes to her family and boyfriend and she wanted to "protect herself" from such disclosure. Although this argument was not fully developed until Bowman's cross examination and Miller's direct examination, both of which took place following the reading of her witness statement, Miller's attorney asked a number of questions about Bowman's veracity to Officers Brown and Neal, both of whom had testified prior to the reading of her witness statement. [Tr.p. 579] Thus, we will not conclude that the trial court erred in allowing Bowman to read her witness statement to Neal during direct examination or in admitting it into evidence.
As to the written statement given to Brown which was admitted into evidence without having first been read to the jury, Bowman was subject to cross examination as to this statement, the statement was consistent with her trial testimony, and was also properly offered to rebut an express or implied charge of recent fabrication or improper influence or motive.
Miller argues that the trial court erred in allowing a police officer to testify (1) that Bowman had felt a burden lifted when she finally told her story and (2) that rape victims do not always tell such stories to their parents. He contends that such opinions were not relevant to the outcome of the case under Evid.R. 401 and were also inadmissible opinions of non-expert witnesses under Evid.R. 701. His attorney properly objected to each of these testimonies.
Evidence is relevant and can be admissible if it has any tendency to make the existence of any fact that is of consequence to the determination of a case more probable or less probable than it would be without such evidence. Evid.R. 401, 402. Testimony regarding the police officer's perception of Bowman's reaction after reporting the incidents of abuse was relevant because her relief had a tendency to support the seriousness and truth of her allegations. Testimony explaining that rape victims do not always report the incidents to their parents was relevant as an explanation for Bowman's failure to inform her parents of Miller's threats and demands. Thus, these testimonies were relevant pursuant to Evid.R. 401.
Evid.R. 701 states that if a "witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of his testimony or the determination of a fact in issue." Under Evid.R. 701, a trial court has wide latitude in allowing or controlling the opinion testimony of lay witnesses. State v. Kehoe (1999), 133 Ohio App.3d 591, 603,729 N.E.2d 431, 439, discretionary appeal not allowed (1999),86 Ohio St.3d 1492, 716 N.E.2d 723.
The first statement, supra, was clearly based on the perception of the officer. In our judgment, the second statement was not an opinion but rather a statement of fact based on the officer's experience. Because the trial court has wide discretion in allowing lay witness opinion testimony, we will not conclude that the admission of the first statement was an abuse of discretion. As to the second statement, we are satisfied that it was relevant and that Evid.R. 701 governing lay witness opinion testimony is not implicated.
Miller also claims that the trial court erred in allowing the prosecutor to "paint the picture throughout the trial" that, while dating other underage females, Miller had threatened them that he would tell lies about them. In his brief, Miller cites us to one page of the transcript wherein the prosecutor questioned Miller about whether he had threatened another underage female that he had been dating by telling her that he was going to tell her mother lies about her. Miller's attorney objected to the prosecutor's question, the trial court sustained the objection and asked the jury to disregard the prosecutor's statement. We note that although the prosecutor did ask Miller questions about the ages of other underage girls he had met through the computer bulletin board system, the prosecutor did not ask him about any threats or lies he had told them. We do not think that the single question, supra, to which Miller's attorney objected successfully and the jury was told to disregard, materially prejudiced Miller.
Miller also argues that the trial court erred in allowing a witness to testify that Miller had threatened him because such testimony violated Evid.R. 404(B). The state called Jesse Libecap, a friend of Miller's, to testify. Libecap testified as follows:
Q: And what if any threats at any time did [Miller] make to you?
* * *
 A: * * * I think it was June of `97. Me and [Bowman] [(sic)] started dating again and [Miller] found out about it. * * * He called my pager and basically threatened to kill me. I'm not sure of the exact wording, but it came across as a death threat and said, if you don't call me back-I don't remember, like I said, I don't remember the exact wording * * *. [Tr.654-655]
Miller's attorney did not object to Libecap's testimony. Miller therefore waived his objection to the admission of that testimony and we will review it under the plain error standard only. The plain error test requires that, but for the error, the outcome of the trial clearly would have been otherwise. State v. Long (1978), 53 Ohio St.2d 91, 97,372 N.E.2d 804, 808.
Evid.R. 404(B) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove" a defendant's criminal propensity. Such evidence is admissible under Evid.R. 404(B), however, "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." See State v. Bey (1999), 85 Ohio St.3d 487, 490-491, 709 N.E.2d 484, 490, certiorari denied (1999), ___ U.S. ___, 120 S.Ct. 587, citing State v. Lowe (1994), 69 Ohio St.3d 527, 530, 634 N.E.2d 616, 619. Assuming arguendo that the trial court's admission of Libecap's testimony was improper, we cannot conclude that but for the existence of the error, the result of the trial would have been otherwise. It is doubtful that Libecap's testimony was surprising to the jury as it had already heard Miller himself make graphic violent threats upon the lives of Bowman, her boyfriend, and family members during the taped phone conversations.
Miller also asserts that the trial court erred in allowing the prosecutor to inform the jury that Miller had filed a plea of not guilty by reason of insanity in the case, even though such plea was later withdrawn.
While threatening Bowman during the taped phone conversations, Miller told her that he did not care if he had to go to prison for killing her boyfriend, that he did not think he would have trouble convincing someone that he was "mentally not with it," and that he could plead insanity and would be sent to a "mental home" for only a year. During cross examination, the prosecutor asked Miller as follows:
 Q: And on those tapes you also said, by the way, if I do anything, I'll just file a not guilty by reason of insanity, I'll end up in a mental ward, right?
A: Yes, sir.
 Q: And you filed one of those, didn't you? Don't look to your lawyer. Answer the question.
MILLER'S ATTORNEY: Objection, Your Honor.
THE COURT: Can the witness answer the question?
A: Under my attorney's advice, yes, we did file a plea at one point.
 Q: So just what you said you were going to do on the tapes, some of those things you did, didn't you?
A: I suppose, yes.
Generally, a prosecutor's conduct at trial will not be a ground for error unless his conduct deprived the defendant of a fair trial. State v. Apanovitch (1987), 33 Ohio St.3d 19, 24, 514 N.E.2d 394, 400, citing State v. Maurer (1984), 15 Ohio St.3d 239, 266, 473 N.E.2d 768, 793, certiorari denied (1985), 472 U.S. 1012, 105 S.Ct. 2714. A defendant is entitled to a new trial only when a prosecutor asked improper questions or made improper remarks that substantially prejudiced defendant. State v. Smith (1984), 14 Ohio St.3d 13, 14, 470 N.E.2d 883, 885. 1995 WL 229123, State v. Awkal, (Ohio App. 8 Dist. 1995)
Assuming arguendo that the prosecutor's question to Miller was improper, we cannot conclude that the prosecutor's question regarding Miller's not guilty by reason of insanity plea substantially prejudiced Miller because prior to the prosecutor's question, the jury had heard Miller tell Bowman that if he was caught for carrying out his threats, he would file an insanity plea.
The fourth assignment of error is overruled.
 V. THE TRIAL COURT COMMITTED PLAIN ERROR IN FAILING TO INSTRUCT THE JURY ON THE LESSER INCLUDED OFFENSE OF SEXUAL BATTERY UNDER R.C. 2907.03.
Miller argues that the trial court erred by failing to instruct the jury on the offense of sexual battery in violation of R.C. 2907.03, a lesser included offense of forcible rape in violation of R.C. 2907.02. In his brief, Miller "recognizes that [his] counsel neither requested the lesser instruction nor objected to the failure to instruct the jury on the lesser offense." [Br.p. 19] He thus asks us to consider the court's failure to instruct on the lesser offense under the plain error standard.
The record reveals that while in chambers discussing the jury instructions on the record, Miller's attorney stated as follows:
 The Defendant is also satisfied [with the jury instructions]. I did speak with [Miller], Your Honor, reviewing the instruction concerning a possible sexual battery instruction. I reviewed with him subsections under the sexual battery statute, and after so reviewing, he has indicated to me that he does not wish me to request a sexual battery instruction to the jury. * * * [Tr.p. 1205-1206]
"Where a defendant fails, based upon tactical considerations, to object to the instructions of the trial court, the defendant cannot claim plain error on appeal." State v. Harris (1998), 129 Ohio App.3d 527, 533,718 N.E.2d 488, 492, dismissed (1999), 84 Ohio St.3d 1469, 704 N.E.2d 578; see State v. Edwards (1985), 26 Ohio App.3d 199, 201, 499 N.E.2d 352,354. Because Miller and his attorney not only failed to request the lesser included offense instruction, but also affirmatively stated that such instruction was not desired, we conclude that their decision was a tactical one. As such, Miller cannot now claim plain error.
The fifth assignment of error is overruled.
The judgment of the trial court will be reversed in part and remanded for resentencing on the two counts of rape consistent with this opinion. In all other respects, the judgment of the trial court will be affirmed.
FAIN, J., and GRADY, J., concur.